**Vernon F. MINTON, Plaintiff,**

v.

**NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC., and The NASDAQ Stock Market, Inc., Defendants.**

No. CIV.A. 9:00–CV–19.

United States District Court,
E.D. Texas,
Lufkin Division.

Feb. 1, 2002.

852

George Michael Jamail, Reaud Law Firm, Beaumont, TX, James Eric Wren, Williams, Pattillo, Squires & Wren, Waco, TX, William C. Slusser, Slusser & Frost, Charles Keith Kebodeaux, Beaumont, TX, Jerry W. Gunn, Houston, TX, for Plaintiff.

Gregory Christopher Mathis, Michael Rocco Cannatti, Randall Louis Sarosdy, Akin, Gump, Strauss, Hauer & Feld, Gray Cary, Austin, TX, George E. Chandler, Chandler Law Offices, Lufkin, TX, for Defendants.

### MEMORANDUM OPINION

COBB, District Judge.

In this patent infringement action,[1] plaintiff Vernon F. Minton ("Minton") alleges that The National Association of Securities Dealers, Inc. ("NASD") and The NASDAQ Stock Market ("NASDAQ") ("Defendants") infringe Minton's United States Patent No. 6,014,643 ('643 patent) entitled "INTERACTIVE SECURITIES TRADING SYSTEM." Currently before the court is Defendants' motion for summary judgment [Dkt. # 59] of invalidity under the on-sale bar provision of Title 35 U.S.C. § 102(b) and Minton's cross-motion for partial summary judgment [Dkt. # 63] of non-invalidity under the on-sale bar provision. Additionally, the court ordered the parties to provide further briefing and relevant evidentiary submissions regarding the four factual obviousness inquiries enunciated in *Graham v. John Deere Co.*[2]

relevant to a § 102(b)/103 bar determination.[3] Because Minton offered to commercially lease a network and software program to a brokerage firm to practice his patented invention more than one year before he filed his application for the patent, the court grants the motion for summary judgment of invalidity of the patent under the § 102(b) on-sale bar. Furthermore, because Minton's invention is rendered obvious by the addition of the leased network and software program to the prior art, the court enters summary judgment of invalidity of the patent under the § 102(b)/103 bar.

## I. Background

### A. Problem to Be Solved

Relevant portions of the Background section of Minton's patent are quoted here at length because they familiarize the reader with the relevant technology and describe the problem that Minton's invention aims to solve.

> For hundreds of years, institutions have existed which allow people to buy and sell securities (e.g., stocks, futures, options, commodities, etc.) from one another. Today, examples of these institutions are: The New York Stock Exchange (N.Y.SE), The National Association of Security Dealers Automated Quotation (NASDAQ) System, and The American Stock Exchange (AMEX). These modern security exchanges facilitate the exchange of several hundred million shares of stock every business day.

> While a significant portion of this trading is initiated by individuals, either directly or indirectly, these individuals cannot trade securities directly on the

1. The court has jurisdiction over the action pursuant to Title 35 U.S.C. §§ 271 and 281 and Title 28 U.S.C. § 1338(a).

2. 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

3. [Dkt. # 69].

above mentioned exchanges. If a user wishes to buy or sell stock or other securities, they must go through a brokerage firm or a stock broker. These brokers are the ones who actually execute a customer's order to buy or sell a security.

There are two primary ways brokers generate income from executing customer orders. First, brokers often charge a commission for executing a customer's order. Depending on the broker, this commission may vary with the number of shares traded. For example, a broker may charge a base rate of $50.00 to execute a trade, plus an-additional 5 cents per share for every share traded. There is nothing secretive about the commission a broker charges, and customers are familiar with the commissions charged by their brokers.

A second way brokers derive income from customers is by taking advantage of the difference between the selling (ask) price and the buying (bid) price of a security. Unlike most consumer items, securities are often listed at two prices: a first price if one is buying the security, and a second price if one is selling the security. The selling price is known as the ask price and the buying price is known as the bid price. For example, if a user asks Broker A for the price of a share of stock from ABC Company, the broker may tell the customer that a share of ABC stock can be bought for $ 50.50, and a share of ABC stock may be sold for $50.10. The bid and ask price are not numbers set by a single entity or government agency, rather, these numbers are generated by a broker and constantly fluctuate as the price of a security moves up or down. The difference between the bid price and the ask price is known as the spread.

A broker can make money on the spread by connecting customers who want to sell a security at a relatively low price with other customers who wish to buy a security at relatively high price. Due to the advanced nature of today's communications systems, a broker is in constant contact with many other brokers and institutions which buy and sell securities. These other brokers and institutions are constantly communicating to a given broker various offers to buy and sell securities, at a range of prices.

As stated above, a broker can make money from executing a customer's order by connecting two customers who are willing to pay different amounts for the same security. For instance, Customer A goes to Broker B and informs Broker B that he wishes to buy one hundred shares of ABC stock for $50.00. Broker B can then log into his communications network to see what other brokers and institutions are charging for one hundred shares of ABC. Broker B may find another broker willing to sell one hundred shares of ABC for $49.50. In this instance, Broker B will, on behalf of Customer A, buy one hundred shares of ABC for the price of $49.50. However, Customer A will be charged $50.00 per share for the stock that Broker B bought for $49.50 per share. Thus, Broker B will be able to keep 50 cents per share, or $50.00 for the one hundred shares of ABC purchased. This type of profit making is allowed to happen, despite the many regulations that brokers operate under. This same situation repeats itself when a broker finds another user willing to pay a higher price than what a given seller is asking.

The above situation repeats itself many times a day, and creates substantial revenues for commodity and stock brokers. Further, a customer has no way to protect himself from this type of exploitation, since customers do not have access to the communications networks of the

broker. Also, customers often do not realize a broker is making money from them in this fashion....

Therefore, what is needed is a data processing system and a network of data processing systems whereby individuals can buy and sell directly from each other, with only minimal involvement by a broker. In such a communications network an individual would be in a similar position to that of a broker, *i.e.*, an individual would have access to many other individuals wishing to buy and sell securities. In such a network, an individual would be able to select among many competing offers to buy and sell, and thus would be able to get a better deal than if they were going though a broker.[4]

## B. Patent Claims

Minton asserts that NASDAQ's Workstation II software program, when used in conjunction with NASD's services, infringes the claims of his patent. The patent has four claims, each claim defining an invention that aims to solve the problem identified above. The parties have focused the bulk of their briefing on claim 1, to which the court will first address its analysis. Claim 1 of the patent reads as follows:

1. A method for trading securities between individuals, comprising:

(1) entering an offer of a first individual to trade a security on a first data processing system;

(2) transmitting the offer to additional data processing systems, including a second data processing system, over a public communication network;

(3) transmitting to the second data processing system additional offers to trade in the security formed by additional individuals;

(4) ranking the offer formed by the first individual and the additional offers formed by the additional individuals according first to a price value, then secondly, according to a quantity value;

(5) displaying the offer formed by the first individual and the additional offers by the additional individuals according to the ranking step on a graphical user interface on the second data processing system;

(6) entering a reply of a second individual on the second data processing system, wherein the reply is in response to the offer;

(7) executing a trade of the security based on information contained in the offer for consideration specified in the reply to the offer, whereby the security is traded efficiently between the first individual and the second individual.[5]

Minton filed his application for patent with the United States Patent and Trademark Office (PTO) on June 28, 1996.

## C. TEXCEN

In the early 90's, Mr. Minton created a company called the Texas International Stock Exchange (TISE) and devoted a substantial amount of time to developing a telecommunications network and software program called the Texas Computer Ex-

4. '643 patent col. 1, line 15 to col. 2, line 25; col. 2, lines 46–55.

5. The numbers in parentheses of the elements, or steps, of the claim do not appear in the original patent, but for clarity of discussion the court has numbered the elements. Additionally, due to the prosecution history of the patent, elements numbered (3), (4), and (5) appear after element (7) ("executing a trade") in the published patent. The court lists them in a different order for ease of understanding since these are the order in which they typically occur, as Minton agrees, and since the claim itself does not specify an order of execution.

change Network ("TEXCEN"). The TEXCEN Software Assistance Guide describes TEXCEN and TISE as follows:

The Texas International Stock Exchange, Inc. (TISE) is an international telecommunications company that developed the Texas Computer Exchange Network (TEXCEN). TEXCEN will be leased to a member of the National Association of Securities Dealers, Inc. (NASD) and the Securities Investor Protection Corporation (SIPC).

TEXCEN is an interactive program available in the Windows environment for public viewing, monitoring, and downloading stock market data. If you decide to become a client of the NASD member, on-line order execution will be added to these services. TEXCEN will be available to the public 24 hours a day, seven days a week.[6]

Minton approached two NASD member brokerage firms—Milkie/Ferguson Investments, Inc. (MFII) and R.M. Stark & Co. (RMST)—about licensing TEXCEN.[7] On March 8, 1995—more than one year before Minton filed his patent application with the PTO on June 28, 1996—Minton entered into a license agreement with RMST to license TEXCEN, which states:

WHEREAS, TISE has developed a telecommunications network and software program called the Texas Computer Exchange Network (*"TEXCEN"*) whereby individuals can access international financial information twenty four hours a day through personal computers; ...

3. **RENT.** For use of *TEXCEN*, RMST agrees to pay TISE rent in the amount of ... [8]

Defendants assert that TEXCEN includes all the elements of the claims of Minton's patent, that Minton offered TEXCEN for sale more than one year before he filed for his patent, and therefore the patent is invalid under the on-sale bar of the patent statute.[9] Minton concedes that TEXCEN was offered for sale more than a year before his patent was filed, but contends that TEXCEN does not include all the elements of the patent claims.

Minton did not disclose TEXCEN to the PTO; therefore, the patent examiner who allowed the claims of Minton's patent was not able to consider the effect of TEXCEN on the patentability of Minton's invention.[10]

Figure A of the APPENDIX is a block diagram from the TEXCEN Software Assistance Guide [11] of the TEXCEN network, which apparently was prepared at a time when Minton planned to engage in a license agreement with MFII. The text accompanying the block diagram states: "You will be linked via your computer and modem to the TISE Host Computer which is linked to the MFII computer network." Figure B of the APPENDIX is Figure 3 from Minton's patent.

Although the lease between Minton and RMST fell through, the following describes how TEXCEN would have operated according to the TEXCEN Software Assistance Guides. A TEXCEN customer may

6. [Dkt. # 59] Exh. L, p. 2.

7. Minton Deposition, 34:8–12.

8. [Dkt. # 59] Exh. E.

9. See Title 35 U.S.C. § 102(b).

10. "Whether the '283 and '968 patents would have issued had the pre-critical date battery packs been considered as part of the prior art is certainly debatable.... It is also of concern that the patentees engaged in seemingly inequitable conduct by failing to disclose the pre-critical date battery pack sales to the Patent Office." *Schreiber Mfg. Co., Inc. v. Saft America, Inc.,* 704 F.Supp. 759, 767 (E.D.Mich. 1989) (finding a § 102(b)/103 bar applicable for summary judgment of invalidity, although not finding inequitable conduct).

11. [Dkt. # 59] Exh. N, p. 13.

install the TEXCEN software program on his personal computer that runs the Windows operating system. The customer may obtain TEXCEN on a floppy disk or by downloading it. The customer then runs TEXCEN, which uses the modem in the personal computer to dial up on the public phone network and connect to the TEXCEN host computer. TEXCEN then allows the customer to create an account with the brokerage firm, such as MFII or RMST. The customer may deposit money in the account by supplying a VISA card number, for example, in order to have working capital with which to buy stocks.

TEXCEN allows the customer to submit offers to buy or sell shares of a particular stock at a price and quantity the customer specifies. The offers are sent to the TEXCEN host computer, which forwards the offers to a broker. The broker validates or approves the offers by determining whether the customer has sufficient funds in his account (if buying) or sufficient shares in his account (if selling). If the broker approves the offer, it is transmitted by the TEXCEN host computer to the customer's computer as well as other customer computers and displayed on their TEXCEN Trade and Execution Screen, which is shown in Figure C of the APPENDIX. Figure D of the APPENDIX is Figure 4 from Minton's patent.

Additionally, the TEXCEN host computer sends to the customer's computer information about offers to buy or sell the stock made by other customers. TEXCEN displays in the Trade and Execution Screen on the customer's computer the offers to buy in one window (designated OFFERS TO BUY in the upper left-hand quadrant of Figure C) and the offers to sell in another window (designated OFFERS TO SELL in the lower right-hand quadrant of Figure C). The offers are listed in a sorted order by price. If any offers have the same price, they are listed in a sorted order by quantity of shares. If any offers have the same price and quantity, they are listed in a sorted order by time. Assuming for example the customer wants to buy or sell the stock at the price and quantity specified in one of the offers listed in the TEXCEN Trade and Execution Screen, he uses his mouse to select one of the offers in the OFFERS TO BUY or OFFERS TO SELL window and clicks on the "Execute" button shown in Figure C. A confirmation screen appears and the user clicks on a "Reconfirm" button. TEXCEN then sends to the TEXCEN host computer an indication that the customer wants to accept the selected offer.

Exactly what happens when the TEXCEN host computer receives the indication of acceptance is disputed, as discussed below; however, the following is clear. If the customer has insufficient shares in his account if selling or insufficient funds in his account if buying, TEXCEN displays for the customer a notice to that effect on the computer screen. Otherwise, the trade is executed, the customer's account is updated, and TEXCEN displays for the customer a notice of confirmation that the stocks were traded.[12] A main issue of dispute is whether TEXCEN itself executes the trade according to the claimed invention.

## II. Analysis

"A patent shall be presumed valid."[13] 35 U.S.C. § 282. "Facts support-

---

**12.** [Dkt. # 46] Exh. 4, MI 01452–54.

**13.** The presumption of validity still applies even though the evidence of the pre-critical date lease of TEXCEN was not before the patent examiner. *See Kahn v. General Motors, Corp.*, 135 F.3d 1472, 1480 (Fed.Cir. 1998), *cert. denied*, 525 U.S. 875, 119 S.Ct. 177, 142 L.Ed.2d 144 (1998); *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed.Cir.1999).

ing a determination of invalidity must be proven by clear and convincing evidence." *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed.Cir.2001).

## A. Summary Judgment

A court shall grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Thus, summary judgment is proper only when no 'reasonable jury could return a verdict for the nonmoving party.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)." *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257. "In determining whether there is a genuine issue of material fact, the trial court must assume that the evidence presented by the non-movant is credible and draw all justifiable inferences therefrom in the non-movant's favor." *Id.* The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## B. § 102(b) Bar

The patent statute prescribes that "[a] person shall be entitled to a patent unless ... the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). Consequently, if the PTO issues a patent, and a district court later determines that the patented subject matter was offered for sale in the United States more than one year before the day the patent application was filed, the court must hold the patent invalid by reason of the on-sale bar imposed by § 102(b). *See Monon,* 239 F.3d at 1257. The product or "subject matter" offered for sale must anticipate—*i.e.,* include all the elements and limitations of—the patent claim allegedly infringed or the on-sale bar does not apply. *See Scaltech Inc. v. Retec/Tetra, LLC.,* 178 F.3d 1378, 1383 (Fed.Cir.1999). Whether an invention is subject to an on-sale bar is a question of law. *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.* 984 F.2d 1182, 1186 (Fed.Cir.1993).

The Supreme Court has recently set forth the two requirements of a § 102(b) on-sale bar. "First, the product [allegedly invoking the on-sale bar] must be the subject of a commercial offer for sale" [14] prior to the critical date, which is one year before the patent application filing date. *Pfaff v. Wells Electronics, Inc.,* 525 U.S. 55, 67, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). The second requirement of the on-sale bar is that the invention must be "ready for patenting" prior to the critical date. *Pfaff,* 525 U.S. at 67, 119 S.Ct. 304. Stated alternatively, if the patentee "could have obtained a patent" on his novel idea at the time he offered it for sale, then it is

14. Minton acknowledges that "the TEXCEN program was leased and never offered for 'sale,' but the lease has the same legal effect as a sale under 35 U.S.C. § 102(b)." [Dkt. # 82] p. 2, n. 1; *See Group One, Ltd. v. Hallmark Cards, Inc.,* 254 F.3d 1041 (Fed.Cir. 2001); *Zacharin v. United States,* 213 F.3d 1366 (Fed.Cir.2000).

ready for patenting. *See Pfaff*, 525 U.S. at 63, 119 S.Ct. 304.

■ One way to show an invention is "ready for patenting" is to show an "actual reduction to practice", that is, the patentee actually made a working model of the invention or performed the method of the invention.[15] *See Pfaff*, 525 U.S. at 67, 119 S.Ct. 304. The actual reduction to practice must include all the elements and limitations of the claimed invention in order to constitute an on-sale bar. Although Minton denies that TEXCEN includes all the elements and limitations of the claimed invention, "Minton warranted that the TEXCEN program was operational and it was operational prior to June 1995," that is, before the critical date.[16]

■ A second way to show an invention is ready for patenting is to show that "prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67, 119 S.Ct. 304. The Court discussed in its reasoning *The Telephone Cases*, involving the patenting of the telephone by Alexander Graham Bell. There it was found that even though Mr. Bell had not actually made a working telephone at the time he filed his patent application, the patent application included a description of the telephone invention that a skilled mechanic could follow to construct a telephone that worked as claimed in the patent application. *Pfaff*, 525 U.S. at 62, 119 S.Ct. 304. Hence, even though Bell had not reduced his telephone to practice, he had obviously conceived of how to do it and had written down his conception in sufficient detail to enable a skilled mechanic to reduce it to practice. Filing a patent application containing an enabling written description is commonly referred to as a "constructive" reduction to practice. Hence, Bell's invention was "ready for patenting" because he "could have obtained a patent," *Pfaff*, 525 U.S. at 63, 119 S.Ct. 304.

In the *Pfaff* case, an engineer-inventor prepared drawings of an integrated circuit socket and offered to sell the socket more than one year before filing a patent application for the socket invention. The inventor stated in his deposition that it was his practice not to make prototypes, but instead to go directly from his drawings to production units, because his drawings were sufficient to do so. No sockets were actually reduced to practice until a date that was less than one year from the patent application filing date, nevertheless, the Supreme Court found that the drawings made the invention "ready for patenting" because the inventor "could have obtained a patent" at that time, and that the pre-critical date commercial offer for sale invalidated the patent.

One of the policies behind the on-sale bar is to prohibit an inventor from extending the length of time he is allowed to commercially exploit his invention beyond the time set out by the patent statute. *See Envirotech Corp. v. Westech Eng'g Inc.*, 904 F.2d 1571, 1574 (Fed.Cir.1990) (citing additional policies: "discouraging removal of inventions from the public domain that the public reasonably has come to believe are freely available; favoring the prompt and widespread disclosure of inventions; allowing the inventor a reasonable amount

**15.** *Pfaff*, 525 U.S. at 57, n. 2, 119 S.Ct. 304 ("A process is reduced to practice when it is successfully performed. A machine is reduced to practice when it is assembled, adjusted and used. A manufacture is reduced to practice when it is completely manufactured. A composition of matter is reduced to practice when it is completely composed.") (internal citations omitted).

**16.** [Dkt. # 63] p. 6; see also Minton Deposition, pp. 517–518.

of time following sales activity to determine the potential economic value of a patent.").

In light of the relevant statutes and case law cited above, the court now determines whether any genuine issue exists with regard to the material facts of whether TEXCEN includes each element and limitation of patent claim 1.

■■■ Before delving into the claim elements individually, a general discussion of the summary judgment evidence is helpful. According to the Supreme Court's second manner of showing the invention was "ready for patenting," the pre-critical date drawings or other descriptions of the invention prepared by the inventor must be "sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff,* 525 U.S. at 67, 119 S.Ct. 304. This "enablement" requirement parallels the language of the enablement requirement of 35 U.S.C. § 112 ¶ 1, which requires the specification of a patent to contain a written description of the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art ... to make and use the [invention]." Thus, it may be concluded that if the pre-critical date drawings or descriptions are at least as enabling as the patent specification, then the pre-critical date drawings and descriptions are enabling and show that the invention was "ready for patenting" as *Pfaff* requires; otherwise, the patent itself would be invalid as failing the § 112 enablement requirement.

In this regard, significant portions of Minton's patent specification are substantially similar to pre-critical date screen output generated by TEXCEN, descriptions of TEXCEN in the TEXCEN Software Assistance Guide provided with TEXCEN, and text files taken from a TEXCEN program diskette. Significant portions of the text of the patent specification are essentially verbatim from the TEXCEN Software Assistance Guide.

Additionally, there is great similarity between the figures of the patent and TEXCEN. A comparison of Figures C and D provides an example of this fact.[17] The patent contains Figures 1 through 12. Figures 1 through 3 are figures of a computer system and a computer network as are well known in the art. Figures 9 through 12 pertain to the claims in the patent application as originally filed directed to a method and network for individuals to "make a market" in a security. The PTO rejected the market making claims, and the court can find no relevance in figures 9 through 12 to the allegedly infringed claims. Figures 4 through 7 are screen shots of screen output generated by TEXCEN. (Figure 4 of the patent is shown above as Figure C of the APPENDIX.) Thus, Figure 8 is the only figure of the patent that is not either directed to the rejected market making claims, well-known prior art, or produced by TEXCEN. However, the steps in the flow-chart of Figure 8 are described in text files printed from a TEXCEN program diskette.[18] Furthermore, the description of Figure 8 in the patent is mainly references to Figures 4 through 7, and includes text taken almost verbatim from the TEXCEN Software Assistance Guide.

■■■ These similarities are not coincidental. Minton stated in his deposition that he provided a copy of the TEXCEN program and TEXCEN Software Assistance Guide to his patent attorney who

---

**17.** Minton Deposition, 111:5–112:3 and [Dkt. # 46] Exh. 4, MI 01434 (both referring to the TEXCEN Trade and Execution Screen shown in Figure C of the APPENDIX as "the heart"

of the TEXCEN program, which is essentially identical to FIG. 4 of Minton's patent).

**18.** Minton Deposition, Exh. 32, Texcen.txt, N–003795–96.

used them to prepare the patent application.[19] The conclusion to be drawn is to the extent some or all of the elements of the allegedly infringed claims are described in the pre-critical date drawings or descriptions in a manner similar to the description in the patent specification, Minton cannot argue that his pre-critical date drawings and descriptions do not meet the *Pfaff* "ready for patenting" requirement.

The vast bulk of Minton's statement of genuine issues is devoted to disputing that TEXCEN performs the "executing a trade" step. The other elements are not disputed individually, but generally with the claim as a whole, based on Minton's deposition testimony.

### 1. "entering an offer" step

The first element of claim 1 is the step of "entering an offer of a first individual to trade a security on a first data processing system." Chapter 4 of the TEXCEN Software Assistance Guide[20] describes TEXCEN's "Buy Parameters Screen." Chapter 4 includes a screen shot[21] of the Buy Parameters Screen, Screen 21, and a four-page description thereof.[22] Screen 21 is essentially identical to FIG. 6 of the patent specification, which states: "FIG. 6 illustrates the screen where information relating to an order to buy a security is entered." The screen enables a user of TEXCEN to enter order parameters, such as price, quantity, and order expiration criteria associated with an offer "to purchase a security for your portfolio."[23] Similarly, Chapter 5 of the Guide describes TEXCEN's "Sell Parameters Screen," which performs a similar function with regard to an offer to sell a security, and which is essentially identical to FIG. 7 of the patent.

To dispute Defendants' evidence, Minton offers only his deposition testimony. Initially, Minton acknowledged that the "entering an offer" step is present in TEXCEN:

Q. Of the '643 patent. Mr. Minton, I'd like to go through—I'd like to refer you to the first element, "entering an offer of a first individual to trade a security on a first data processing system"?
A. Okay.
Q. That element is found in the TEXCEN computer program, is it not?
A. Yes, sir.[24]

However, after a break in the deposition, Minton decided the step was not present in TEXCEN. "Exhibit 33," referred to in the deposition excerpt below, is a two-column table in which the elements of claim 1 are written in the left-hand column, and the right-hand column was blank so that Mr. Minton could indi-

---

**19.** Minton Deposition, 189:12–14; [Dkt. # 59] Exh. A, pp. 16–18. The court recognizes it is common and acceptable practice for an inventor to provide an embodiment of his invention to his patent attorney or agent to aid in preparation of a patent application. Although this fact may be irrelevant in most contexts, it may be probative in an on-sale bar context.

**20.** [Dkt. # 46] Exh. 4, MI 01444–47.

**21.** The screen shot is from the Microsoft Windows operating system, a well-known graphical user interface.

**22.** The description of FIG. 6 in the patent specification is roughly the same length and includes a similar description of the screen.

**23.** [Dkt. # 46] Exh. 4, MI 01444.

**24.** Minton Deposition, 577:16–23.

cate whether each element of the claim was found in TEXCEN.

A. Okay. Before I do that, I wanted to let you know that I marked these other elements "no" as well on Exhibit 33, for the same reason. Wherever the word "individual" is used, on the TEXCEN program, it may or may have not been an individual.

So I wanted to let you know that before you got surprised and looked at this document.

Q. So you have now changed your—in the document itself, you have just written "no" in every block; is that right?

A. Yes, sir.

Q. And you did that after—after the break we just took?

A. Yes, sir.

Q. After—okay. After talking to your counsel?

A. It—I talked to them, but they didn't—they're not the ones that told me to do this.

Q. I'm not asking you to tell me what they said.

A. Okay.

Q. And—but the only reason you put "no" in each block was because of the word "individual"?

A. Yes, sir. In this—this—in the context of this patent, an individual is not a broker, a specialist, or a market maker. In the TEXCEN program, the buyers could be brokers.

Q. Okay. So—and under your—under the '643 patent, you're saying that an individual cannot be a broker, market maker, or specialist?

A. Yes, sir.

Q. And is that—is that anywhere in—explained in the—in any of the elements of the patent that are listed on the left-hand side of Exhibit 33?

A. No, it's in the specification.

Q. Is it in your—strike that.

In the TEXCEN program, the buyer—the buyers could be individuals, could they not?

A. Yes. And they could be brokers and market makers.[25]

As the quoted deposition extract shows, Minton's reason for changing his mind about whether TEXCEN performed the "entering an order" step—and other steps of the claim—was his belief that the term "individual" in the patent claims should be construed to exclude brokers, specialists, and market makers. Hence, according to Minton, it is a limitation of the claim that an "individual" cannot be a broker, specialist, or market maker. For this reason, Mr. Minton apparently believed that TEX-CEN did not anticipate claim 1 because TEXCEN did not include that limitation, since TEXCEN could be used to buy securities not only by "individuals" as he defined the term, but also by brokers, specialists, and market makers.

Minton's changed answer is based on his erroneous construction of the claim term "individual." Minton's deposition statements were given before the court's opinion on claims construction[26] was issued,

---

**25.** Minton Deposition, 591:11–592:22.

**26.** [Dkt. # 62].

and the statements concerning Minton's belief of the proper construction of the term "individual" conflict with the court's construction of the term. The court determined that the plain language of the claim did not preclude brokers from using the invention to trade "as individuals for their own sake" and that "the explicit language of the claims places no restriction or limitation on the identity of the traders." [27] Furthermore, Minton's alleged construction of the term "individual" is somewhat dubious in light of the fact that in the context of being asked whether the NASDAQ Workstation II software infringes his patent he stated:

Q. Your system is designed to allow brokers to trade?
A. Brokers could trade on it, sure.
Q. For other people's accounts?
A. And for themselves. They just can't hide the orders anymore.[28]

Thus, TEXCEN is not precluded from anticipating the claim for the reason Minton gave, i.e., with respect to the meaning of the term "individual." Consequently, Minton's deposition testimony confirms that TEXCEN performs the "entering an offer" step, rather than raising a genuine issue of the fact.

### 2. "transmitting the offer," "transmitting . . . additional offers," and "entering a reply" steps

Elements (2), (3), and (6) of claim 1 are the steps of "transmitting the offer to additional data processing systems, including a second data processing system, over a public communication network," "transmitting to the second data processing system additional offers to trade in the security formed by additional individuals," and "entering a reply of a second individual on the second data processing system, wherein the reply is in response to the offer." The TEXCEN Software Assistance Guide shows that TEXCEN performs these steps.[29]

Again, Minton offers only his deposition testimony as evidence to dispute the evidence that TEXCEN performs elements (2), (3), and (6). Like the first element, Minton initially acknowledged in his deposition that all three of these steps are present in TEXCEN,[30] but later changed

27. Additionally, the court construed the recitation of "A method for trading securities between individuals" in the preamble as a statement of intended use, not an actual claim limitation. [Dkt. # 62].

28. Minton Deposition, 331:21–25.

29. [Dkt. # 59] Exh. L, p. 8; Minton Deposition, Exh. 32, Texcen.txt, N–003794 to N–003798; [Dkt. # 46] Exh. 4, MI 01434–43; [Dkt. # 63] p. 8 ("The TEXCEN program allowed investors to select particular offers to sell or buy securities").

Element (2), p. 583:
Q. Okay. Let's look at the next element, Mr. Minton. "Transmitting to the second data processing system additional offers to trade in the security formed by additional individuals." Would that element be found in the TEXCEN computer program?
A. Yes, sir.
Element (3), p. 577–578:
Q. Okay. Let's look at the second element, "transmitting the offer to additional data processing systems, including a second data processing system, over a public communication network." That element is found in the TEXCEN computer program, is it not?

30. Minton Deposition:

his mind based on his erroneous construction of the claim term "individual." For the reasons discussed above with respect to the first element, Minton's deposition testimony supports the fact that TEXCEN performs elements (2), (3), and (6), rather than raising a genuine issue about the fact.

### 3. "ranking the offer … and additional offers" and "displaying the [ranked] offers" steps

■ Elements (4) and (5) of claim 1 are the steps of "ranking the offer formed by the first individual and the additional offers formed by the additional individuals according first to a price value, then secondly, according to a quantity value" and "displaying the offer formed by the first individual and the additional offers by the additional individuals according to the ranking step on a graphical user interface on the second data processing system." Chapter 3 of the TEXCEN Software Assistance Guide describes TEXCEN's "Trade and Execution Screen." Chapter 3 includes a screen shot of the Trade and Execution Screen, Screen 18, and a six-page description thereof.[31] Screen 18 is essentially identical to Figure 4 of the patent specification, which states: "FIG. 4 illustrates the trading screen of the program controlling a user's data processing system according to the present invention." As the Software Assistance Guide states: "The Trade and Execution Screen is divided into four quadrants: The upper left quadrant lists all Offers to Buy (Bids) of the selected security (stock). The offers are listed in order with respect to price, size, and time, in that order."[32] "The lower right quadrant lists all Offers to Sell (Asks) of the selected security. These offers are listed in order with respect to price, size, and time, in that order."[33]

To dispute NASD's evidence, Minton again offers only his deposition testimony. Minton's testimony confirms rather than disputes the fact that TEXCEN ranked offers first according to price, second according to quantity and displayed the ranked offers.[34]

■ Minton confirmed that TEXCEN does rank offers according to price, then according to quantity. However, Minton stated that TEXCEN was different because it further ranks according to time.[35] Yet, the fact that TEXCEN also

A. Yes, sir.

Element (6), p. 578:

Q. Let me refer you to the third element, "entering a reply of a second individual on the second data processing system, wherein the reply is in response to the offer." That element is also found in the TEXCEN computer program, is it not?

A. Yes, sir.

**31.** The description of FIG. 4 in the patent specification is roughly the same length and includes a similar description of the screen.

**32.** [Dkt. # 46] Exh. 4, MI 01439.

**33.** [Dkt. # 46] Exh. 4, MI 01443.

Q. And then the next element, sir, is "Ranking the offer formed by the first individual and the additional offers formed by the additional individuals according to first to a price value, and then secondly, according to a quantity value." Mr. Minton, would that element be found in the TEXCEN computer program?

A. Partly.

Q. Well, it is found in the sense that there is a ranking, which we've—which we've looked at in the

**34.** The same discussion above with respect to Minton changing his mind based on his erroneous claim construction of the term "individual" applies here as well.

**35.** Minton Deposition, pp. 583–584:

ranks third according to time does not keep the "ranking" element from reading upon TEXCEN, *i.e.*, does not keep TEXCEN from anticipating the "ranking" element. It is a fundamental tenet of claim anticipation that if "everything in the claim appear[s] in the item of prior art ... then the terms of the claim are satisfied by the item under review. The claim is said to 'read' upon that item. It matters not that other elements or structures appear in that item which do not appear in the claim.... If the claim 'reads' upon ... a statutory item of prior art, then the claim is 'anticipated' by that item of prior art and is invalid or unpatentable."[36] Thus, the fact TEXCEN does more than the patent claim step requires does not negate the fact that TEXCEN anticipates the

step.[37] Therefore, Minton's answer does not raise a genuine issue of material fact with respect to the "ranking" step.

Minton stated in his deposition that TEXCEN does not perform the "displaying" step.[38] However, Minton's answer is again based upon an erroneous construction of the claim term and/or a misunderstanding of the law regarding claim anticipation. Minton's reason for believing TEXCEN did not anticipate the "displaying" step is that TEXCEN did not display *all* the orders.[39] However, according to the court's construction of claim 1, "it is only necessary that a minimum of two offers be transmitted in the transmitting step and that three or more offers to trade in a security be ranked by the ranking step and then displayed by the displaying

software assistance guides and a ranking, remember, of price, size, and time. Do you recall that?
A. Yeah. The TEXCEN program uses time.
Q. Okay. So that's the difference. It uses price, size, and time?
A. Yes, sir. And it—it includes a method of ranking.
Q. Okay. But it would be—so the—so would your answer be yes, but the TEXCEN program does a few other things?
A. Yes, sir.

**36.** See 2 Patent Practice 13–14 (PRI 1993). The court recognizes that Professor Kayton is referring to an entire claim; however, the same principle applies to individual limitations within a given claim element.

**37.** This is further supported by the court's opinion on claim construction: "Irrespective of the internal sorting methodology or algorithm that is used, when the final set of offers

to trade (composed of at least three offers) is displayed, the viewer of the display will perceive the entire list of offers to be sorted with price as the primary key and quantity as the secondary key, while other sorting keys [such as time] may be applied as tertiary key(s)." [Dkt. # 62].

**38.** Minton Deposition, 584:13–589:19.

**39.** Minton Deposition, p. 585:

Q. But the TEXCEN program did display individual offers and other offers on the—on the—that trade and execution screen, did it not?
A. Yes, but not all the individual orders.
Q. Well, it didn't display all the individual orders, but it displayed offers formed by the first individual and additional offers by additional individuals, does it not?
A. Yes. This last element you're reading, it doesn't quantify just some. It says all—it, in effect, means all.
Q. Well, it doesn't say all—but it doesn't say all, does it?
A. Well, it doesn't say partly. It doesn't quantify.

step. *It is not necessary that all offers be transmitted, ranked, or displayed.*[40] Again, rather than raising a genuine issue, Minton's deposition testimony supports Defendant's evidence that TEXCEN performs the "displaying" step.

### 4. "executing a trade" step

■ Element (7) of claim 1 is the step of "executing a trade of the security based on information contained in the offer for consideration specified in the reply to the offer, whereby the security is traded efficiently between the first individual and the second individual." In his brief for the *Markman* hearing, Minton proposed the meaning of the trade execution step was "that an agreement has been reached between two individuals for the purchase and sale of a security."[41] Defendants did not dispute the meaning of the executing step. The court adopted Minton's proposed construction, and in the context of identifying the corresponding structure of claim 3's means-plus-function language, the court construed the trade execution step as follows:

> The function "executing" is essentially the smallest part of the invention, in that it requires only a status change in one or possibly two memory location(s). It is that switching of state where offer and acceptance come together to form a contract.[42]

The only explanation in Minton's patent specification of how a memory location in a computer might be changed to indicate an agreement has been reached is as follows: "Once User B selects User A's order, this information is sent back to the server (840). Once User B's selection arrives at the server, the server can then note that a transaction has occurred."[43] As may be seen, Minton gives very little description about how his invention executes the trade other than "the server can then note that a transaction has occurred." This is commensurate with the court's description of the trade execution step as essentially the smallest part of the invention. The pre-critical date drawings and descriptions are much more extensive than the patent specification's description of the trade execution step as the following citations show. Hence, there is no genuine issue about whether the pre-critical date drawings and descriptions enable one skilled in the art to practice the trade execution step; otherwise, Minton's patent would be invalid for lack of § 112 enablement.

The TEXCEN Software Assistance Guide lists as one of TEXCEN's highlights:

> **Immediate Execution—***TEXCEN* has an exclusive agreement with the broker dealer RMST. All Offers to Buy (Bids) and Offers to Sell (Asks) are firm and not indications of interest (quotes). This means RMST has the verified funds and securities are available (deposited) for every offer to buy and every offer to sell BEFORE the order is entered on the Trading Screen. Therefore, when you click *TEXCEN* Market in the Buy or Sell Parameters Screen, *TEXCEN* and RMST are able to immediately execute your trade and issue your confirmation.[44]

---

40. [Dkt. # 62] (emphasis added).

41. [Dkt. # 44] p. 7.

42. [Dkt. # 62].

43. '643 Patent, col. 13, lines 37–39. The designation numeral "840" refers to a block in the flowchart of FIG. 8 of the patent. The next and last block in the flowchart is block 845. Although designation numeral 845 is never referred to in the patent, the text in block 845 of FIG. 8 says, "Server completes trade and notifies Users A and B of the Completed Transaction."

44. [Dkt. # 46], Exh. 4, page 114, MI 01530.

Additionally, Minton's deposition testimony states in reference to a description of TEXCEN in a text file taken from a TEXCEN program diskette:

Q. In the—could you skip down a few paragraphs, Mr. Minton, to the one that says—it begins "Therefore, quotes are not firm, but only a snapshot." Do you see that paragraph? It's the fourth from the bottom.
A. Okay.
Q. And then it says, "It is impossible for the broker to give you this information in real time, but not with TEXCEN." Could you explain what that sentence means? That's, I think, a reference to—it's a contrast—a comparison of a program not using TEXCEN with one using TEXCEN, is it not?
A. Yes, sir.
Q. Okay. And what is that—what are you talking about there?
A. If you call your broker and ask for a quote during this time frame in our history, it wasn't a firm quote; in other words, those quotes were not executable. They were just indications of the market. They weren't firm contracts.
Q. But under TEXCEN, they were firm contracts?
A. Yes, sir.
Q. And in fact, in the next sentence, you say, "All offers are firm," all caps, "and ready to be negotiated or executed," correct?
A. Yes, sir.
Q. And that's what the TEXCEN program did?
A. Yes, sir.
Q. Gave each individual firm offers ready to be executed immediately?
A. Yes, sir.
Q. So that they could trade electronically?
A. Yes, sir.
Q. With each other?
A. No, not directly with each other, but—
Q. Subject to the approval of the broker?
A. Yes, sir.
Q. Through the trading desk and a specialist, I think you said?
A. Yes, sir.[45]

Finally, Table 1 illustrates the similarity of the language of the TEXCEN Software Assistance Guide and Minton's patent regarding trade execution.

| TEXCEN S/W Assistance Guide | '643 Patent |
| --- | --- |
| click on the specific Offer to Buy (Bid) or Sell (Ask), then click Execute. Once the Execute button is clicked and ReConfirmed, the order will be directed through TEXCEN to RMST for immediate validation, approval, | After the user selects a given offer to buy or sell, the user will then activate execute button 420. Next, the user will be given one more chance to reconfirm the order they entered into buy screen 600 or sell screen 700. After a user reconfirms the order, the order will be directed through the network for immediate validation, approval, and execution. |

**45.** Minton Deposition, 574:20–576:8 (referring to Exh. 32, N–003796).

| | |
|---|---|
| and execution. RMST will verify funds are available when buying to Open, securities are in good deliverable form when Selling to Close [Dkt # 46] Exh. 4, p. 26, MI 01436 | Validation by a broker consists of verifying that funds are available when buying securities and, that the securities are in good deliverable form when selling. col. 12, lines 39–47 |
| TEXCEN only [46]—Your limit order will be entered only on TEXCEN [Dkt. # 46] Exh. 4, p. 114, MI 01530 | If RMST only field [47] is activated, a user's order will only be displayed to other users of the individual securities trading network. col. 11, lines 34–36. |

Table 1.

■ As with other steps in claim 1, Minton conceded that TEXCEN performed the trade execution step were it not for a limitation based on his interpretation of claim 1. Minton stated in his deposition that—based on his proposed *Markman* construction of the executing step the court adopted—the executing step would be found in TEXCEN if the word "efficiently" were not included in the claim.[48] As with other claim elements, Minton's assertion that TEXCEN does not perform the executing step is based on an erroneous construction of claim 1.

■ The "efficiently" limitation to which Minton refers is in a "whereby" clause of claim 1. The normal rule of construction is that "a whereby clause that merely states the result of the limitations in the claim adds nothing to the substance of the claim." *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 249 F.3d 1314, 1324 (Fed.Cir.2001) (citing *Texas Instruments Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1172, 26 USPQ2d 1018, 1023–24 (Fed.Cir.1993)); *cf. McClarin Plastics, Inc. v. LRV Acquisition Corp.*, 215 F.3d 1343, 1999 WL 507188 at *2 (Fed.Cir.1999) (unpublished opinion). Minton's proposed construction of the exe-

cuting step of claim 1 does not include a limitation that the trade be executed "efficiently," but only "that an agreement has been reached between two individuals for the purchase and sale of a security." Minton did not argue at the *Markman* stage for inclusion of the limitation, much less provide the court with an explanation of what might constitute a security being "efficiently traded." Therefore, the court concludes that the "traded efficiently" language is not a claim limitation. Rather, that the security is traded efficiently between the two individuals is simply an inherent result of the claimed steps of displaying the various ranked offers, replying to one of the offers, and reaching an agreement of the trade based on the offer and reply. *See Titanium Metals Corp. of America v. Banner*, 778 F.2d 775, 782 (Fed.Cir.1985). Based on the court's construction of the claim, Minton's deposition testimony does not create a genuine issue of whether TEXCEN performs the trade execution step, but instead supports that fact.

Minton raises two other objections to the proposition that TEXCEN could execute trades according to the executing step of claim 1 that require analysis.

---

46. See [Dkt. # 46] Exh. 4, MI 01444.

47. See Fig. 6 of the '643 patent which is essentially identical to the TEXCEN Buy Parameters Screen 21 on MI 01444 of [Dkt. # 46] Exh. 4. "TEXCEN only" has been changed to "RMST only."

48. Minton Deposition, 578:11–583:11.

Minton's first objection is that TEX-CEN did not allow for trading securities "between individuals," but merely allowed an individual to communicate an offer to his broker, similar to but more expeditiously than sending a fax or making a phone call, and the broker had to execute the trade in the traditional way.[49] This argument ignores an important distinction between the information TEXCEN provides to a broker and the information provided to a broker via a fax or phone call in the traditional scenario. In the traditional scenario, the individual faxes his broker a message that says, "sell 500 shares of GM stock at $100 per share," or "buy 100 shares of Microsoft at market." Importantly, the fax does not specify the other side of the trade. That is, the identity of the other party to the contract is not identified, and in the second message an agreed upon price is not supplied. In contrast, TEXCEN provides the broker with information identifying the other side of the trade and an agreed upon price. This is possible because TEXCEN's Trade and Execution Screen allows the individual to select the other side of the trade, enabling TEXCEN to provide the broker with critical additional information not present in the traditional fax or phone call, namely the other side of the trade at an agreed upon price.

Thus, with TEXCEN the broker does not execute the trade in the traditional way. Rather, in the traditional way, the broker must find the other side of the trade as part of trade execution; however with TEXCEN, the broker does not have to find the other side of the trade in order to execute the trade, because TEXCEN provides this information. In other words, the information received by the broker from TEXCEN includes all the information necessary to form a contract, namely the identity of the two parties to the contract, and the price and number of shares of the particular stock to be traded. The only limitation in the executing step is that the trade be executed "based on information contained in the offer for consideration specified in the reply to the offer,"[50] which is precisely the information TEXCEN provides to the broker. Finally, the offer that TEXCEN provides the individual the ability to select is a "firm" offer, according to Minton's deposition testimony and the pre-critical date drawings, which is possible because the broker approves the offers before they are displayed for acceptance.

■ By asserting that TEXCEN merely allowed an individual to communicate an offer to his broker, similar to but more expeditiously than sending a fax or making a phone call, and the broker had to execute the trade in the traditional way, perhaps Minton is referring to the fact that TEXCEN enables trades of securities in two modes. One mode is in fact a traditional mode, and a second mode is the one described in the previous paragraph. These two modes are referred to in the Software Assistance Guide as "Broker Execution" and "TEXCEN Execution," respectively.[51] In the Broker Execution

---

**49.** In this regard, Minton argues that NASDAQ did not institute the limit order rule until 1997; therefore TEXCEN would have been of no interest to RMST before such time. Minton's argument is a *non sequitur.* It does not follow that because NASDAQ now *requires* individual orders to be displayed, that NASDAQ previously *prohibited* individual orders from being displayed. See Minton Deposition, 97:6–99:12.

**50.** The limitation "whereby the security is traded efficiently" was analyzed above.

**51.** [Dkt. # 59] Exh. L, pp. 41,48. The fee charged the customer is less if the customer uses TEXCEN Execution rather than Broker Execution.

mode, the customer does *not* select the other side of the trade, but merely communicates to the broker the "sell 50 shares of GM at $100" message. However, in the TEXCEN Execution mode, the customer selects the other side of the trade, and TEXCEN provides to the broker all the information necessary to form a contract for sale of the security, as discussed above. However, Minton is mistaken if he believes the on-sale bar requires that all modes or embodiments offered for sale anticipate the claimed invention. If *any* embodiment of the claimed invention was offered for sale prior to the critical date, the first prong of *Pfaff* is satisfied. *See Scaltech, Inc. v. Retec/Tetra, LLC.*, 269 F.3d 1321, 1329–30 (Fed.Cir.2001).

Minton's second objection is that the broker trade desk executed the trades, not TEXCEN. To support Minton's contention, he offers the TEXCEN Software Assistance Guide, a letter from RMST, and Minton's own deposition testimony and declaration. The TEXCEN Software Assistance Guide states: "Once the [Execute] button is clicked and verified, *the order will be directed through TEXCEN to the broker for* immediate validation, approval, *execution,* confirmation, then your account will be updated."[52] The Guide further states: "This [Trade and Execution] screen allows you to identify, select and execute securities transactions *through a broker dealer* and member of the NASD."[53] Additionally, in a letter from RMST to NASD answering questions posed by NASD about TEXCEN's capabilities, the following statement appears: "TEXCEN will not provide order execu-

tion. When RMST receives an order from its customer via TEXCEN, it will, as always, be responsible for transmitting the order to the RMST trading desk for routing and execution."[54] Finally, Minton's deposition testimony indicates that TEXCEN did not execute a trade, but required a broker to do so.[55]

There are two implicit assertions in Minton's argument that TEXCEN does not execute trades. The first implicit assertion regards the construction of claim 1, namely that claim 1 excludes any broker involvement in the executing a trade step. The second implicit assertion regards exactly what was included in the lease agreement between Minton and RMST, namely that the lease agreement did not include the computer having the memory location that is changed to indicate an agreement was reached between the TEXCEN customer making the offer accepted by another TEXCEN customer. For the following reasons, the first assertion is incorrect, and the second is resolved in Minton's favor in the summary judgment context.

The reader is referred to Figure A of the Appendix, and reminded that the TEXCEN Software Assistance Guide states: "You will be linked via your computer and modem to the TISE Host Computer which is linked to the MFII computer network." Hence, there exists the TEXCEN network of computers that includes the customer workstations linked to the TEXCEN Host Computer. Linked to the TEXCEN network is the broker network of computers, which includes the broker "Trading Executions" computer ("trade desk computer").

---

**52.** [Dkt. # 59] Exh. L, p. 43 (emphasis added).

**53.** *Id.*, p. 10 (emphasis added).

**54.** [Dkt. # 63] Exh. B, N–011664, letter dated January 3, 1996. Although the date of the letter is after the critical date, Minton de-

clares that the statement is true for all versions of TEXCEN supplied to or offered for sale to R.M. Stark at any time, which would include the pre-critical date offers for sale. See [Dkt. # 73] Declaration of Vernon F. Minton, ¶ 2.

**55.** See Minton Deposition, pp. 522–523.

The trade desk computer includes the memory location that is changed to indicate that an agreement had been reached between the parties to the trade. When a first TEXCEN customer accepts the offer of a second TEXCEN customer by clicking on the second customer's offer in the TEXCEN Trade and Execution Screen, the first customer's computer sends a message to the TEXCEN Host Computer, which in turn sends a message to the trade desk computer with the information contained in the offer and acceptance.

The evidence supports two possibilities regarding what occurs when the TEXCEN Host Computer sends the message to the trade desk computer. One possibility is that the trade desk computer notifies the broker—such as displaying a message on the trade desk computer screen—that the parties want to trade, and the broker performs an action—such as entering keystrokes on the trade desk computer keyboard—to change the memory location to indicate the agreement was reached. Another possibility is the trade desk computer automatically changes the memory location—without any broker involvement—to indicate the agreement was reached. The court resolves the dispute in favor of the non-movant Minton and concludes the first possibility.

Implicit in Minton's argument is that claim 1 requires a limitation that the broker be excluded entirely from the step of changing a memory location to indicate that an agreement has been reached between the two individuals based on the information received in the offer and reply. With an eye toward infringement during the *Markman* proceedings, Minton argued for a broad construction of the trade execution step; now in the peril of invalidity, Minton argues for a narrower construction. The only limitation appearing in the executing step of claim 1 is that a memory location in a computer is changed to indicate the sale agreement "based on information contained in the offer for consideration specified in the reply." The executing step of claim 1 includes no limiting language to exclude an intermediate step between the entering of the reply and the changing of the memory location to indicate the agreement has been reached. There is no recitation in claim 1 that the causal link between the entering of the reply and the changing of the memory location must be direct so as to exclude the broker performing an intermediate step. If Minton had wanted to narrow the scope of his invention to include such a limitation, he could have included it in claim 1 or drafted a narrowing claim depending from claim 1. Although the patent specification discloses an embodiment with the narrowing limitation, the court declines to import the non-recited limitation into claim 1. *In re Donaldson Co., Inc.*, 16 F.3d 1189, 1195 (Fed.Cir. 1994).

██ It is a well-settled principle of claim construction that as long as a prior art reference includes all the limitations of a claim, the reference anticipates the claim even if it includes additional limitations beyond the claimed limitations. There is no genuine issue that TEXCEN performs the first six steps of claim 1, and that the TEXCEN Host Computer provides to the trade desk computer the information contained in the offer and reply indicating the two TEXCEN customers want to trade the security. Furthermore, there is no genuine issue that the trade desk computer memory location is changed in response to the broker entering input into the trade desk computer in response to the offer and reply information received from TEXCEN. Thus, even resolving in Minton's favor that the broker performs an intermediate step in TEXCEN, because the court does not import Minton's implicit claim limitation,

claim 1 reads upon the operation of the network shown in Figure A. There is no genuine issue that Minton's invention was ready for patenting prior to the critical date. That is, any reasonable jury would find that Minton "could have obtained a patent" on the invention of claim 1 prior to the critical date, thereby satisfying the second prong of *Pfaff*. However, this does not end the inquiry.

 Minton's second implicit assertion is that the lease agreement did not include leasing the entire network of Figure A, namely the trade desk computer— the computer having the memory location which is changed to indicate an agreement is reached between the two TEXCEN customers—and that consequently the first prong of *Pfaff* is not met. "[T]he first determination in the § 102(b) analysis must be whether the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention." *Scaltech Inc. v. Retec/Tetra, LLC.,* 178 F.3d 1378, 1383 (Fed. Cir.1999). There is a genuine issue as to whether the trade desk computer of Figure A was part of the lease agreement between Minton and RMST. Because this is a material fact, the court resolves the dispute in favor of the non-movant Minton and concludes the trade desk computer was not part of the lease agreement. However, this does not prevent a § 102(b) on-sale bar for the following reasons.

First, changing the memory location in the trade desk computer to indicate that an agreement has been reached between the two TEXCEN customers is the natural result flowing from the message sent to the trade desk by the TEXCEN Host Computer. *Scaltech, Inc. v. Retec/Tetra, LLC.,* 269 F.3d 1321, 1328–29 (Fed.Cir. 2001). Executing the trade is not simply a

probable or possible result; it is the only result taught by the message. *Id.* The message is sent for no other purpose than to instruct the trade desk to execute the trade. Indeed, it is not even sent to instruct the broker to find another individual who might be willing to trade at the offered price; instead, the other party to the trade and agreed upon price are provided to the broker in the message.

Second, the TEXCEN Software Assistance Guide is part of the product offered for lease. As discussed above, there is no genuine issue that the Software Assistance Guide teaches the trade execution step—as well as the other claimed steps. Minton objects that the Software Assistance Guide is not prior art. However, Minton provides no evidence to raise a genuine dispute that the Software Assistance Guide was not included in the offer for sale in the face of evidence that indicates the contrary.[56] Furthermore, it cannot genuinely be argued that a lease of a product as sophisticated as TEXCEN would not include documentation instructing the lessee and its customer users on how to use the leased product.

 Third, in the context of a method claim—in contrast to an apparatus or composition of matter claim—the court questions whether "the subject of the barring activity" might allow inclusion of a tool or device clearly in the public domain needed to practice a step of the method which is already owned by the purchaser in the barring offer for sale. Commonly in on-sale bar cases involving a method claim, it is not the method itself that is offered for sale. Instead it is a product—a device, system, or composition of matter—offered for sale that enables the purchaser to practice the claimed method. *See, e.g., Robotic*

---

56. Minton provided the TEXCEN Software Assistance Guide along with his pre-critical date offer letter to R.M. Stark to lease TEX- CEN. See [Dkt. # 59] Exh. D; Declaration of Scott DeArmey at 1.

*Vision Systems, Inc. v. View Engineering, Inc.*, 249 F.3d 1307 (Fed.Cir.2001). Although the court can find no case applying *Pfaff* to address the question directly,[57] the court concludes the lease of the TEXCEN network and software—even if the trade desk computer was already owned by RMST—satisfies the first *Pfaff* prong because it would have enabled RMST to practice Minton's claimed method.

The case of *Helifix Ltd. v. Blok–Lok, Ltd.*, 208 F.3d 1339 (Fed.Cir.2000), although not explicitly addressing the question, is instructive. *Blok–Lok* involves a patented method of securing two walls of masonry together using steel rods having spiral-shaped flutes similar to a drill bit. The rods are not inserted into the walls by drilling them in, because this would create a cylindrical hole the diameter of the rod. Instead, the rods are hammered into the walls using a hammering tool similar to a jackhammer. The tool does not grip the rod, but instead allows the rod to freely rotate as it penetrates the walls. The rotation of the rod causes the rod to corkscrew in the wall, which creates grooves in the walls shaped like the flutes of the rod. The friction force between the grooves and the rod create a binding force between the two walls superior to what would occur simply by drilling cylindrical holes in the walls and inserting cylindrical rods therein. The steps in the method include essentially:

1) drilling a hole in the first wall with a diameter smaller than that of the steel rod;

2) drilling a pilot hole in the second wall;

3) driving the rod into the walls through the hole and pilot hole using the hammering tool as described above which creates the grooves;

4) removing the tool from the rod; and

5) finishing the exposed end of the rod according to mandates of the site.

■■■ The patent owner distributed fliers at a trade show more than one year before the patent's filing date that described the method and offered the rods for sale. The appeals court opined that if on remand the district court determined that a pre-critical date hammering tool that enabled performance of the driving step had been developed, then an on-sale bar would apply. The relevant point is that there are at least three steps in the claimed method—the hole drilling steps and the finishing step—that would likely be performed using tools already owned by the buyer of the rods and/or hammering tool and not necessarily sold by the patent owner.[58]

■■■ In the instant case, there is no genuine issue that the products necessary to perform all the steps of the claimed invention were ready for patenting prior to the critical date. Similarly, the fact that the lessee may have already owned one of the "tools" necessary to perform one of the steps of the claimed method should not prevent application of the on-sale bar. This reasoning is consistent with the policy of the on-sale bar articulated by the Supreme Court. *Pfaff*, 525 U.S. at 64–65, 68, 119 S.Ct. 304. Minton has commercially benefited—or would have if the lease had not fallen through—from his invention for more than the year grace period allowed

---

**57.** Perhaps this is the meaning of footnote 2 of the Federal Circuit's *Pfaff* opinion discussed below at footnote 59 of this opinion. At a minimum, the addition of TEXCEN to the prior art renders Minton's claimed invention obvious as discussed below.

**58.** The on-sale bar is not limited to pre-critical date offers for sale by the patentee, but may also be satisfied by offers for sale by third parties. *Abbott Laboratories v. Geneva Pharmaceuticals, Inc.*, 182 F.3d 1315, 1318 (Fed.Cir.1999).

by the statute. The fact that the lease fell through makes Minton's situation a sympathetic one. It would appear that in Minton's case one year was not sufficient time for him to determine the potential economic value of his patent, which is a goal of the one-year grace period. Nevertheless, Congress has chosen one year as the allotted time, which courts or patentees may not extend. Additionally, allowing Minton to avoid the on-sale bar simply because the trade desk computer was not part of the lease would hinder the prompt and widespread disclosure of inventions, which § 102(b) seeks to encourage. *Special Devices, Inc. v. OEA, Inc.*, 270 F.3d 1353, 1357 (Fed.Cir.2001).

 Based on the foregoing, the court finds that resolving all genuine issues regarding the underlying facts requires a conclusion that the lease of TEXCEN constitutes an on-sale bar to the validity of Minton's patent under § 102(b) as expounded by *Pfaff*.

## C. § 102(b)/103 Bar

 The court concludes that claim 1 of Minton's patent is also invalid as being obvious in light of TEXCEN and other relevant prior art. "The on-sale bar is not limited solely to a sale of, or an offer to sell, a product that anticipates the later patented invention. It also applies if 'the subject matter of the sale or offer to sell . . . would have rendered the claimed invention obvious by its addition to the prior art.' In effect, what was offered for sale before the critical date becomes 'a [prior art] reference under section 103 against the claimed invention.' Because of the conjunctive use of sections 102(b) and 103, this bar has been called the § 102(b)/103 bar." *Pfaff v. Wells Electronics, Inc.*, 124 F.3d 1429, 1436 (Fed.Cir.1997) (internal citations omitted). Because TEXCEN was offered for sale before the critical date, it becomes prior art with regard to a § 103

obvious analysis. Hence, the court now considers whether TEXCEN "would have rendered the claimed invention obvious by its addition to the prior art."

35 U.S.C. § 103 states in relevant part: A patent may not be obtained though the invention is not identically disclosed or described as set forth in Section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

 The Supreme Court in *Graham v. John Deere Co.* outlined the legal procedure by which a court determines whether "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains," referred to more succinctly as making an obviousness determination. First, the fact finder must determine the scope and content of the prior art. *See Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Second, the fact finder must determine the differences between the prior art and the allegedly infringed claims. *Id.* Third, the fact finder must determine the level of ordinary skill in the pertinent art. *Id.*

 Unlike an anticipation determination that involves only a single prior art reference, an obviousness determination necessarily involves combining elements or limitations of two or more prior art references to render the claimed invention obvious. Because a court has the benefit of seeing the elements already combined in the patent claims when determining

whether it would have been obvious to combine the elements from the prior art references, an inherent temptation exists to "Monday-morning quarterback." However, § 103 requires that the invention be obvious "at the time the invention was made," not after the invention is disclosed. Therefore, in deciding the legal question of obviousness, the court may not look to the patent claims as a guide for combining different elements or limitations of the prior art references to piece together the patent claims. *Ruiz v. A.B. Chance Co.,* 234 F.3d 654, 664–65 (Fed.Cir.2000). That is, the court must determine whether the invention would have been obvious "at the time the invention was made" without the benefit of hindsight now that the inventor has taught the claimed invention to the court. *Id.*

In order to circumscribe a hindsight obviousness determination, the courts have required the defendant to show a teaching, suggestion, or motivation to combine the prior art references at the time the invention was made. *Id.* Common sources of the teaching, suggestion, or motivation to combine include the prior art references themselves, the knowledge of ordinarily skilled artisans, and the nature of the problem to be solved. *Id.* The teaching, suggestion, or motivation to combine the references may be implicit or explicit. *Id.*

At the summary judgment stage, the defendant must show clear and convincing evidence of each of the factual inquiries. Further, the defendant must show that no genuine issue exists with regard to the factual inquiries, and that the facts show the invention is obvious, or that resolving factual issues in favor of the non-movant patent owner the invention is obvious. *Karsten Mfg. Corp. v. Cleveland Golf Co.,* 242 F.3d 1376, 1384–85 (Fed.Cir. 2001).

There is yet a fourth factor the court must take into consideration in its obviousness determination—the objective indicia of nonobviousness, also referred to as "secondary considerations" of obviousness. *Graham v. John Deere Co.,* 383 U.S. at 17, 86 S.Ct. 684 ("Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."). If the defendant makes a *prima facie* showing of obviousness based on the first three *Graham* factors, the burden shifts to the patent owner to show nonobviousness based on objective indicia thereof. *See Winner Int'l Royalty Corp. v. Wang,* 202 F.3d 1340, 1350 (Fed.Cir. 2000). The court must consider the objective indicia of nonobviousness as a factor in determining obviousness; however, they are only a factor among the other factual inquiries. *See Ryko Manufacturing Co. v. Nu–Star, Inc.,* 950 F.2d 714, 719 (Fed.Cir. 1991) ("secondary considerations of obviousness must be considered, but do not control the question of obviousness.") (internal citations omitted). Hence, even taking as true assertions of the objective indicia does not necessarily dictate denial of summary judgment based on obviousness.

Once the factual determinations are made, the court may then as a matter of law make an obviousness determination based on the underlying factual inquiries. *Pfaff,* 124 F.3d at 1436. In *Pfaff,* the Federal Circuit found that the sockets offered for sale before the critical date did not anticipate two of the allegedly infringed claims. In particular, a barb element recited in the two claims was not present in the pre-critical date drawings of

the sockets offered for sale. However, the court found that the barb element was present in a prior art reference and that the knowledge of one skilled in the art would provide the motivation to combine the barb element in the prior art reference with the product offered for sale, thereby making the invention defined by the two claims obvious. *Id.* at 1437–39.[59]

### 1. The Scope and Content of the Prior Art and Differences Between the Prior Art and the Claims of the Patent

Although Defendants have offered other prior art references, the court need only consider here TEXCEN and United States Patent No. 3,573,747 (*Adams* ), since they are sufficient to support a finding of obviousness. TEXCEN has been discussed at length above.

The *Adams* patent, entitled "INSTINET COMMUNICATION SYSTEM FOR EFFECTUATING THE SALE OR EXCHANGE OF FUNGIBLE PROPERTIES BETWEEN SUBSCRIBERS," was issued in 1971 and discloses a method and communication system for automatically buying and selling securities. INSTINET was a commercially operating interactive securities trading system and was the subject matter of the *Adams* patent. Minton acknowledged in his deposition that the INSTINET system was similar to TEXCEN, the main difference being that TEXCEN allows "individuals" to trade, whereas INSTINET allowed institutional investors to trade.[60] Additionally, *Adams* did not teach ranking offers first by price and second by quantity of shares and then displaying the ranked offers.

The *Adams* patent disclosed institutional investors entering offers to buy and sell securities on the INSTINET system. The offers were recorded in a "book" on an electronic storage element of the system. The offers in the book were transmitted to

**59.** Footnote 2 of the Federal Circuit's *Pfaff* opinion appears to indicate some difference between a standard § 103 obviousness determination and a § 102(b)/103 determination. "The district court seemingly based its § 103 nonobviousness determination primarily on its view that '[n]o combination of prior art suggested by Wells teaches all of the limitations in claims 11 and 19.' In the context of a § 103 obviousness determination, this conclusion may be correct. Here, however, the only element not on sale was the barb." *Pfaff*, 124 F.3d 1429, 1437, n. 2. The difference, if any, would seem to be relevant here since the "executing a trade" step is the only claim element possibly missing in TEXCEN, *i.e.*, about which there is a genuine issue of material fact. However, because the court cannot discern the distinction possibly raised by footnote 2, it proceeds under a standard § 103 analysis including TEXCEN as contained in the set of prior art references. In particular, the invention must be obvious as a whole. It is not enough for an individual element to be obvious. Although *Graham* requires a court to determine "the differences between the prior art and the claimed invention ... to support a determination of the issue of obviousness, the actual determination of the issue requires an evaluation in the light of the findings in those inquiries of the obviousness of *the claimed invention as a whole,* not merely the differences between the claimed invention and the prior art." *Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 890 (Fed.Cir.1984). Hence, it would be improper to merely determine whether the trade execution step alone would have been obvious.

**60.** Minton Deposition, 649:1–9. Minton's acknowledgement was in the context of a comparison between TISE and INSTINET prepared for presentation to the Securities and Exchange Commission (SEC) for the purpose of obtaining a "no-action" letter from the SEC. Since the SEC had issued a no-action letter for INSTINET, TISE hoped to persuade the SEC that a no-action letter should be issued for TEXCEN based on their similarities. The comparison states: "THE INSTINET SCREEN WILL SIMULTANEOUSLY COMBINE ORDER ENTRY, NEGOTIATION AND EXECUTIONS CAPABILITIES." Minton Deposition, Exh. 38, page 3, MI 00229.

other investors on the system for display on a printer. When one investor accepted the offer of another investor, a subprogram executing on the system updated the book to indicate the trade and notified each of the investors of the accepted offer.

Minton contends that none of the limitations of his patent are found in *Adams* because *Adams* did not disclose "individuals" trading securities. Apparently, and without explicitly stating such, Minton bases his contention on an interpretation of the claim term "individual" to exclude institutional investors, whom the INSTINET system of *Adams* was designed to allow trading between. Assuming this is Minton's basis, the court finds no support for the contention that institutional investors are not encompassed by the claim term "individual."

The patent examiner who examined Minton's patent application found that *Adams* disclosed all the elements of claims 1 and 3—including the trade execution step [61]—except the step of ranking the offers first by price and second by quantity, and therefore rejected all but four of the originally submitted claims based either solely on *Adams* or on *Adams* in combination with other prior art patents.[62] The examiner allowed the four remaining claims (now claims 1–4 in the '643 patent) over *Adams* based on the absence of the ranking step in *Adams*.[63] The examiner specifically equated "individuals" with "subscribers or buyer[s] and sellers" referred to in *Adams*. This conclusion is consistent with the court's previous order on claims construction.[64] Furthermore, Minton admitted in his deposition that the

claim term "individuals" could include entities other than "ordinary people," such as corporations.[65]

The court concludes that no genuine issue exists regarding the fact that *Adams* includes all the elements of claim 1 except the ranking and displaying steps.

## 2. The Level of Ordinary Skill in the Art at the Time the Invention Was Made

■ Pursuant to the *Markman* hearing, the court determined that a person of ordinary skill in the art "must know more than just how to trade securities.... and ... must possess a broad computer technology background to implement the structure required to practice the patent, including a knowledge of computer programming, client-server architectures, hardware configuration, network configuration and messaging protocols, graphical user interfaces, and finally, electronic securities trading." [66]

Minton provides no basis for obviating the court's determination. Instead, Minton contends with no evidentiary basis that the appropriate person is "a securities trader or broker, having at least a bachelor's degree (or its equivalent) and two years of securities trading experience." Minton's contention is incorrect because it fails to address all the relevant art. The enablement requirement of § 112 is instructive since both it and the obviousness requirement look to the "art to which the subject matter pertains." The difference between the two standards is that the enablement requirement looks to a person of "skill" in the art, whereas the obvious-

---

**61.** [Dkt. # 46] Exh. 7, 0000112–13. Minton also acknowledges that *Adams* teaches executing trades. See [Dkt. # 82] at 10 ("TEXCEN did not execute trades nor did TEXCEN provide for communication between institutions. Adams did.").

**62.** [Dkt. # 46] Exh. 7, 0000112–18.

**63.** [Dkt. # 75] Exh. R, p. 2.

**64.** [Dkt. # 62].

**65.** Minton Deposition, 13:19–14:6; 73:16–25.

**66.** [Dkt. # 62].

ness requirement looks to a person of *"ordinary* skill" in the art. Without at least some knowledge in the art of computer technology—particularly computer programming and networking, client-server architectures, and graphical user interfaces—even a *skilled* securities trader or broker could not take Minton's patent specification and make and use the invention. Hence, the definition must also include at least some knowledge in those arts.

Resolving the issue in Minton's favor at the summary judgment stage and including the relevant art, the court defines a person having ordinary skill in the art to be an electronic securities trader having at least a bachelor's degree or equivalent knowledge and two years of securities trading experience with moderate knowledge of computer programming and networking, client-server architectures, and graphical user interfaces.

■■■ Minton asserts that direct trading between individuals at the time the invention was made would not have been permitted under NASDAQ's regulations, and therefore trading between individuals would not have been obvious to a person of ordinary skill in the art at that time. Minton bases the assertion on the fact that after the invention was made, the SEC adopted a new rule requiring entities like NASDAQ to display customer orders in order to "enhance competition and pricing efficiency," *i.e.,* to keep brokers from pocketing the spread.[67]

However, Minton himself states that at the time he made his invention it was common knowledge that the solution to the

problem of brokers pocketing the spread was allowing individuals to see the offers of other individuals, which Minton referred to as "full disclosure." [68] Thus according to Minton, the person of ordinary skill in the art already knew that displaying individual orders for individuals was generally the solution to the problem—whether or not he knew how to accomplish this prior to having knowledge of TEXCEN is a different question—and did not need the SEC to adopt the new rule to educate him of this fact. Finally, Minton's argument is a *non sequitur,* as already discussed.

### 3. Teaching, Suggestion, or Motivation to Combine Prior Art

As discussed above, the ranking and displaying steps are the only steps missing in *Adams.* TEXCEN teaches the ranking and displaying steps. Additionally, the court assumes for the sake of the obviousness analysis that the trade execution step of claim 1—changing a memory location in a computer to indicate that an agreement has been reached between an individual buyer and seller of a security—is possibly missing in TEXCEN because it was resolved in Minton's favor that the trade desk computer was not included in the lease to RMST. *Adams* teaches changing a memory location in a computer to indicate that an offer by one buyer/seller has been accepted by another seller/buyer of a security using the INSTINET system.[69]

Defendants offer evidence that the nature of the problem to be solved, the knowledge of ordinarily skilled artisans, and TEXCEN itself provide teachings, suggestions, and motivations for a person of ordinary skill in the art to combine the

**67.** [Dkt. # 82] p. 9; Exh. A, p. 2, NASD 068081.

**68.** Minton Deposition, 30:10–22; 86:1–9; 622:16–623:4. Additionally, the TEXCEN Software Assistance Guide lists as one of TEXCEN's highlights: "**Full Disclosure**—The public is able to view all *TEXCEN* Offers to Buy (Bids) and Offers to Sell (Asks)." [Dkt. # 46], Exh. 4, page 114, MI 01530.

**69.** [Dkt. # 75] Exh. Q, col. 23, lines 30–34; col. 7, lines 15–32.

trade execution step taught in *Adams* with TEXCEN to render the claimed invention obvious and, additionally, to combine the ranking and displaying steps taught by TEXCEN with *Adams* to do the same.

■ First, TEXCEN and *Adams* attempt to solve a similar problem: [70] allowing individual investors to directly communicate their offers to buy or sell a security with one another, rather than having an intermediary broker find the other party with whom to trade.[71] Defendants' expert declares without rebuttal, there were relatively few electronic securities trading systems in existence at the time Minton made his invention, and the INSTINET system described in *Adams* was one of them, motivating a person of ordinary skill in the art to look to *Adams* to solve the similar problem. Except for the order ranking criteria, TEXCEN and *Adams* did solve the problem similarly. Minton attempts to distinguish TEXCEN and *Adams* by asserting that TEXCEN did not provide for communication between institutions. There is no evidence to support the assertion that institutional investors could not use TEXCEN to trade. Finally, Minton attempts to distinguish TEXCEN and *Adams* by asserting that TEXCEN was intended for a broker to communicate with an individual customer. While this may be true, TEXCEN users are able to communicate with one another in the same relevant sense that INSTINET users are able

---

**70.** "The problem confronted by the inventor must be considered in determining whether it would have been obvious to combine references in order to solve that problem." *Diversitech Corp. v. Century Steps, Inc.*, 850 F.2d 675, 679 (Fed.Cir.1988); *see also Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 935 (Fed.Cir.1990).

**71.** *Adams:*

"The area of the securities market places and the institutional investors ... required a new device which would enable these institutional investors to communicate information directly with one another so that they could, where they were interested in buying and selling a specific security, deal directly with each other without going through an intermediary." "It is a further object of this invention to provide a communication system wherein the trading of fungible properties can be effectuated without the necessity of a human negotiator between buyers and sellers. It is a still further object of this invention to provide a communication system wherein buyers and sellers using said communication system can receive simultaneously information pertaining to a negotiation between said buyers and sellers." *Adams*, col. 1, lines 16–24, 47–55.
 TEXCEN:
"Investors who wish to buy and sell in the stock market, through TEXCEN, may do so directly without broker assistance." [Dkt. # 59] Exh. L, p. 4.

"Full Disclosure—The public is able to view all TEXCEN Offers to Buy (Bids) and Offers to Sell (Asks)." [Dkt. # 46], Exh. 4, p. 114. "TEXCEN will allow investors to:
 ● Display all customer limit orders nation wide on the network 24 hours a day.
 ● Negotiate directly buy/sell orders on-line from home or office with the other side.
 ● Execute transactions with instant settlement in the decimal system."
Letter from Minton to R.M. Stark [Dkt. # 59] Exh. D.
"The TEXCEN Trade and Execution Screen is almost like an electronic newspaper with offers to buy and sell." Minton Deposition, Exh. 32, Texcen.txt, N–003794–97. The reference goes on to describe a private stock trade between two individuals using newspaper advertisements that "does not have to go through a broker dealer," and analogizing it to the process of how TEXCEN enables a similar trade electronically. Although TEXCEN describes a broker approving the trade and issuing confirmation of it, the broker is not involved in selecting the other party to the trade. Even Minton's patent does not eliminate broker involvement. Instead, as the patent states and Minton acknowledges in his deposition, the invention requires "minimal broker involvement." The patent specification describes broker involvement to pre-approve offers by verifying that sufficient funds and securities are available in the parties' accounts and "other oversight procedures normally performed by a broker."

to communicate with one another, namely by viewing and accepting one another's offers.

Second, Defendants provided unrebutted expert testimony that the knowledge of a person of ordinary skill in the art would provide the motivation to combine TEXCEN and *Adams*.[72] *See Pfaff*, 124 F.3d at 1439.

Third, as discussed at length above, TEXCEN teaches the trade execution step. However, assuming *arguendo* the contrary, there is no genuine dispute that TEXCEN teaches, suggests, and motivates a person of ordinary skill in the art to look to a reference such as *Adams* to teach the trade execution step. TEXCEN teaches that the TEXCEN customer's selection of the offer to accept is routed through TEXCEN to the broker for execution.[73] As discussed above, TEXCEN inherently teaches the trade execution step. *See Scaltech, Inc. v. Retec/Tetra, LLC.*, 269 F.3d 1321, 1328–30 (Fed.Cir.2001). Furthermore, Defendants' expert unrebuttedly declares that publications in the art of electronics securities trading readily available at the time the invention was made provide a blueprint to combine the "ranking" and "displaying" steps of TEXCEN with *Adams*.[74]

Minton contends that it would be improper to combine TEXCEN and *Adams* because TEXCEN, "unlike *Adams*, was intended for a broker to communicate with an individual customer."[75] The implication is that TEXCEN was *not* intended for an individual to communicate with another individual customer. This is false, as already discussed. Furthermore, Minton neglects to specify in his statement exactly what TEXCEN is capable of communicating to the broker. As discussed above, TEXCEN communicates all the information necessary to form a contract between the two parties to the trade, namely, the identity of the two parties, the particular stock to be traded, and the price and quantity agreed upon. This is quite different from the information contained in a traditional trade communication between an individual and his broker, which does not include the other party to the trade.

Based on the forgoing discussion of the first three *Graham* factual inquiries, the court concludes that Defendants have made a *prima facie* showing that the invention of claim 1 is obvious. That is, the differences between the invention of claim 1 and TEXCEN and *Adams* are such that the invention as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art as defined by the court.

### 4. Objective Indicia of Non–Obviousness

Minton asserts three objective indicia of nonobviousness: 1) the commercial success of Defendants' allegedly infringing product; 2) a long felt but unsatisfied need for Minton's invention; and 3) the failure of others to make Minton's invention.

### a. commercial success

Even if an invention is facially obvious—*i.e.*, if the first three *Graham*

**72.** [Dkt. # 75], Exh. U, ¶ 8, Declaration of Ian Domowitz.

**73.** "Execute—After entering your order in the Buy or Sell Parameter Screen, click on the specific Offer to Buy (Bid) or Sell (Ask), then click **Execute**. Once the **Execute** button is clicked and **ReConfirmed**, the order will be directed through *TEXCEN* to **RMST** for immediate validation, approval, and execution." [Dkt. # 59] Exh. L, p. 12 (describing the "Execute" button in the TEXCEN Trade Execution Screen).

**74.** [Dkt. # 75], Exh. U, ¶ 5, Declaration of Ian Domowitz.

**75.** [Dkt. # 82] p. 10.

facts indicate that the differences between the prior art and the invention are such that the invention would have been obvious to a person having ordinary skill in the art at the time the invention was made—there may be other indications that the invention was not obvious. Commercial success of the invention is one such indication. Particularly, if the patentee can show a direct causal connection, a "nexus," between the invention and its success in the market, this may be a strong indication that the invention was not obvious.[76] Otherwise, one would have to ask: "would not other ordinarily skilled artisans to whom the invention would have been obvious been motivated to commercially exploit the invention?" Furthermore, an infringer's success in commercially selling an infringing product may be considered as evidence of the commercial success of the claimed invention. *See Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed.Cir.2000) (citing *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed.Cir.1997)).

■■■ Minton states that the "commercial success of the invention is proved by the great increase in trading volume realized after defendants began infringing the '643 patent." However, this statement is the entirety of Minton's briefing on the

commercial success issue.[77] Because the court finds that Defendants have established a *prima facie* case of obviousness based on the first three *Graham* factors, the burden of production to establish nonobviousness shifts to Minton. *See Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1350 (Fed.Cir.2000). As Defendants have pointed out, Minton's statement fails to establish an increase in trading volume, that the NASDAQ Workstation Level II infringes the patent, when the alleged infringement began, and a nexus between the alleged volume increase and the invention. Thus, Minton has failed to raise a genuine issue about whether the alleged commercial success of the invention shows its nonobviousness.[78]

### b. long felt but unsatisfied need

■■■ The fact that no one has come forth with a particular invention to satisfy a need felt for a long time may also be an indication that a *prima facie* obvious invention was not obvious at the time it was made. Minton alleges the almost thirty year gap between the *Adams* patent and his own patent proves there was a long felt but unsatisfied need for his invention, which solves the problem of brokers pocketing the spread to the detriment of consumers, as stated in the background section of his patent. Assuming

---

**76.** *See Simmons Fastener Corp. v. Illinois Tool Works, Inc.*, 739 F.2d 1573, 1575 (Fed.Cir. 1984).

**77.** Minton also states that the lack of commercial activity on his part is not probative because he has had to focus his time since issuance of the patent in January 2000 on stopping Defendants from infringing his patent. The statement does not explain Minton's lack of commercial development in the three and one half years prior to the issuance of the patent. Nevertheless, it is the *presence* of commercial success that potentially establishes nonobviousness, not explanations of the *absence* of commercial success.

**78.** Minton contends "there is no need to submit affidavits containing evidence of these allegations, since defendants have not moved for summary judgment under § 103." Minton makes the contention in spite of the court's explicit order to brief the issue. Furthermore, Defendants stated in their response to the court's order that they are entitled to summary judgment under the § 102(b)/103 bar; nevertheless, Minton still failed to provide evidence in its response to Defendants' claim of entitlement to summary judgment under the § 102(b)/103 bar.

the statements rise to the level of evidence, the court considers them.

First, one must ask whether Minton's invention actually satisfied the need. See 2 D. Chisum, Patents § 5.05[1][d] at 5–579 ("Finally, it must appear that the inventor's solution in fact satisfied the long-felt need, that is, reached a result superior to prior solutions. For this reason, it is common for supporters of patent claims to combine evidence of long-felt need with evidence of the commercial success of the invention.") (citing *Caldwell v. United States*, 202 Ct.Cl. 423, 481 F.2d 898 (1973), *cert. denied*, 416 U.S. 938, 94 S.Ct. 1938, 40 L.Ed.2d 288 (1974)). It is plain to see how Minton's idea—of allowing individuals to trade with one another with minimal broker involvement, thereby obviating the need for a broker to find the other side of the trade, which is accomplished by allowing individuals to see each other's offers and select the best offer—could *in theory* solve the problem stated. However, Minton readily admits that he has not developed the idea into a product,[79] much less a product that has helped anyone keep his broker from pocketing the spread. The best Minton can do is to point to the Defendants' product to have helped someone do this. But Minton has not met his burden of production in this regard, as discussed above.

Second, *Adams* did substantially solve the problem Minton states. *Adams* allowed investors, albeit institutional investors, to trade directly with one another and avoid the need for an "intermediary" or "human negotiator." As the patent examiner stated, the only novelty Minton added was the criteria of ranking and dis-

playing the offers first by price, second by quantity. Minton has not shown that any product developed from his invention has helped anyone avoid his broker pocketing the spread, much less that any causal connection exists between the ranking criteria and helping someone avoid his broker pocketing the spread.

Third, the "long time" during which the unsatisfied need is felt, which Minton claims is 30 years, must be examined closely. Although the *Adams* patent was public for 30 years, TEXCEN only co-existed with *Adams* for a matter of months before Minton's invention was made. TEXCEN incorporates computer network technology that has changed drastically during those 30 years. For example, individuals did not have access to personal computers during much of the time. Hence, the stated 30 year gap is not as indicative of nonobviousness as it might first appear.[80].

### c. failed attempts

 The fact that others have attempted to solve a known problem but have failed may also be an indication that a *prima facie* obvious invention was not obvious. However, Minton has offered no evidence of failed attempts by others, but only the assertion that there is an absence of prior art for trading securities between individuals. Even if such an absence did exist, the absence alone would not be evidence that others have affirmatively attempted and failed.

### 5. Would the Subject Matter as a Whole Have Been Obvious?

Unlike some cases where the obviousness of an invention must be decided, the invention in this case involves the arguably

**79.** Minton Deposition, 25:15–25; 75:15–77:16.

**80.** Judge Learned Hand stated that the secondary considerations test, which he referred to as the "history of the art" test, "is a dan-gerous test to apply, and will lead one astray unless jealously watched." *Textile Mach. Works v. Louis Hirsch Textile Mach.*, 87 F.2d 702, 702 (2nd Cir.1937), *aff'd*, 302 U.S. 490, 58 S.Ct. 291, 82 L.Ed. 382 (1938).

more "technologically prosaic" art of securities trading, albeit electronic, and is one in which "the operative principles of the device are more comprehensible to the ordinary layperson, and the state of the prior art more fully understood." *Sarkisian v. Winn–Proof Corp.*, 697 F.2d 1313, 1320, n. 16 (9th Cir.1983). In such cases, the Ninth Circuit noted a "tendency [by courts] to translate this comprehension into the conclusion that the invention was obvious," and pointed out the value of the secondary considerations in serving as a check on that tendency. *Id.* The court heeds the admonition. Nevertheless, the court concludes that claim 1, as a whole, is invalid for obviousness.

## D. Network Claims and Dependant Claims

▉ Claim 3 is directed to a network for performing the method of claim 1. Claim 3 includes nine elements, which are means for performing the seven steps recited in claim 1, along with means for performing two additional steps not present in claim 1: "transmitting means for transmitting the offer to a server after the first individual forms the offer" and "obtaining means for obtaining approval of the offer by a broker before the offer is transferred to the second individual."

For the *Markman* hearing, Minton proposed the following undisputed meaning of the transmitting means element: "a modem or an equivalent transmitting device such as cable modems, local area networks, wireless communications, fiber optic lines, and others that enables a computer to transmit information to a server, for transmitting the offer to a server after the first

individual forms the offer." [81] Minton also proposed the following undisputed meaning of the obtaining means element: "a device which permits a broker to verify that funds are available when buying securities, or that the securities are in good deliverable form when selling." [82] TEXCEN teaches both of the steps and the structural means for performing them. [83] Furthermore, the patent examiner found that these elements were taught in the *Adams* patent. [84]

In light of the court's opinion on claims construction—given the references in the TEXCEN Software Assistance Guides to modems ("transmitting means"), keyboards and mice ("entering means"), computer screens ("displaying means"), computer systems, which inherently include processors ("ranking means") and memory ("executing means" and "obtaining means"), and networks—the court also finds claim 3 invalid for the reasons discussed above with respect to claim 1.

Dependent claims 2 and 4 add the further limitation of a pointing device to select the desired offer from the displayed offers. A pointing device includes a mouse, which a TEXCEN user employs. [85] Therefore, claims 2 and 4 are also invalid.

## E. Entrance of Summary Judgment for Obviousness Sua Sponte

▉ It is well established that a district court may enter summary judgment *sua sponte* as long as the losing party had notice of the possibility and a "full and fair opportunity to ventilate the issues." *Massey v. Del Laboratories, Inc.*, 118 F.3d 1568, 1573 (Fed.Cir.1997); *See also Millar v. Houghton*, 115 F.3d 348, 350

---

**81.** [Dkt. # 44] p. 15.

**82.** [Dkt. # 44] p. 16.

**83.** [Dkt. # 46] Exh. 4, p. 26; Minton Deposition, Exh. 32, Texcen.txt, N–003795–97; [Dkt. # 59] Exh. N, p. 13; Exh. L, pp. 4–5,8, 12.

**84.** [Dkt. # 46] Exh. 7, p. 3.

**85.** "TEXCEN's Screens have large buttons to allow for easy 'clicking' with your mouse." [Dkt. # 59] Exh. L, p. 1.

(5th Cir.1997). Furthermore, "there is nothing inherently improper about the district court entering summary judgment for a non-movant. In many cases, where the factual record has been well developed before the summary judgment stage, the grant of summary judgment to the non-movant may well be the most efficient manner to decide a case. Where, as in the instant case, the parties have engaged in extensive cross-motions for summary judgment, such a *sua sponte* grant may be appropriate. *See* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure,* § 2720 (1983)." *Massey,* 118 F.3d at 1572. In this case, the court by its order gave Minton clear notice that it might enter summary judgment of invalidity pursuant to a § 102(b)/103 obviousness bar and ample opportunity to provide the court reasons to do otherwise. In vacating the district court's *sua sponte* summary judgment grant in *Massey,* Judge Rader stated: "the determination of whether the district court offered Massey a full and fair opportunity does not turn on Massey's surprise that the issue was raised, but more so on Massey's surprise that the district court would consider granting summary judgment on the ground of obviousness." *Massey,* 118 F.3d at 1573. Unlike the plaintiff in *Massey,* Minton cannot be surprised at the court now entering summary

judgment, because the court specifically ordered Minton to brief and provide evidence regarding a § 102(b)/103 obviousness bar.

In his response to the court's order to brief the obviousness issues, Minton stated: "Without having seen defendants' evidence on these factual issues ... plaintiff is not fully able to identify where the factual disputes preventing summary judgment will lie." [86] Whatever validity this complaint may have had at the time it was made, it is now baseless because defendants did submit their evidence on the factual issues of obviousness [87] and Minton had ample time and opportunity to respond.[88] Minton did in fact file a response to defendants' submission of evidence. Whether Minton failed to take advantage of his opportunity because he could not dispute the evidence, or whether he chose to rely upon his misreading of *Massey,* the court cannot tell. Whatever the reason, it is the court's opinion that Minton failed to provide evidence to raise a material issue of fact with regard to a § 102(b)/103 obviousness bar.[89]

## III. Conclusion

For the reasons set forth above, the court holds that all claims of United States Patent No. 6,014,643 are invalid. Defendant's motion for summary judgment [Dkt.

86. [Dkt. # 82] note 7.

87. [Dkt. # 75]

88. Although the court initially gave the parties a deadline to answer the court's questions, the court placed no limitations on the responses that the parties might make. The motion history in the case—namely that the court had freely granted the parties leave to file replies, surreplies, responses to surreplies, motions to enlarge page limitations, motions for extensions of time, etc. on other issues without objection—should make clear that the parties were invited to brief the § 102(b)/103 obviousness bar issue to their full satisfaction.

Indeed, the parties have had in excess of four months from the court's order to brief and provide evidence on the issue.

89. Even if Minton had not been given an opportunity to see Defendants' evidence of obviousness in order to dispute it, which he was, Minton was ordered to submit evidence regarding the obviousness factual issues, which might dispute defendants' subsequent evidence. In other words, if Minton had evidence relevant to the obviousness factual issues, he should have submitted it as the court ordered regardless of whether he had seen defendants' evidence yet.

# 59] is **GRANTED,** and Plaintiff's cross-motion for partial summary judgment [Dkt. # 63] is **DENIED.**

 **IT IS SO ORDERED.**

APPENDIX

Figure A.

Figure B.

Figure C.

400

Figure D.